# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF COLUMBIA

_____ )
)
MOHAMED BACHIR SULEMANE                    )
Av Bernabe Tawe No. 786                    )
Maputo, Mozambique                         )
                                           )
                          *Plaintiff,*     )
                                           )
          v.                               )          CIV. NO. 1:16-cv-1822
                                           )
                          *Defendant,*     )
                                           )
JACOB J. LEW                               )          **COMPLAINT**
in his official capacity as                )
Secretary of the Department of the Treasury )
1500 Pennsylvania Avenue, NW               )
Washington, D.C. 20220                     )
                                           )
                          *Defendant,*     )
                                           )
          and                              )          **ECF Case**
                                           )
THE UNITED STATES DEPARTMENT               )
OF THE TREASURY, OFFICE OF FOREIGN         )
ASSETS CONTROL                             )
1500 Pennsylvania Avenue, NW               )
Treasury Annex                             )
Washington, D.C. 20220                     )
                                           )
                          *Defendant.*     )
                                           )
_____ )

1

# I.

## INTRODUCTION

1.      This lawsuit arises from defendant Office of Foreign Assets Control's ("OFAC")

wrongful and improper decision on April 2, 2015, to deny Plaintiff's, Mohamed Bachir

Sulemane, request for rescission of his designation as a Specially Designated Narcotics

Trafficker (SDNTK) under the Foreign Narcotics Kingpin Designation Act ("Kingpin

Act"), 21 U.S.C. §§ 1901, *et. seq*., and the removal of his name from the Specially

Designated Nationals and Blocked Persons ("SDN") List.

2.      On June 1, 2010, Plaintiff and three business entities allegedly associated with

him were designated pursuant to the Kingpin Act.[1]  As a result of these designations,

Plaintiff and the businesses' property and interests in property within U.S. jurisdiction are

blocked, any future property entering the United States in which they maintain an interest

will be blocked, and U.S. persons are barred from engaging in virtually all transactions

with them.

3.      On November 30, 2010, Plaintiff filed a formal administrative request for

reconsideration of his designation and the designations of three business associated

alleged to be owned or controlled by him.  That request was made pursuant to OFAC's

delisting procedures set forth in 31 C.F.R. § 501.807

4.      Nearly four (4) and a half years later, on April 2, 2015, OFAC denied Plaintiff's

request for reconsideration.  Due to OFAC's denial, Plaintiff's property and interests in

---

[1] PRESS RELEASE, *Treasury Sanctions Entities Owned by Drug Kingpin Mohamed Bachir Suleman Treasury Action Targets Narcotics Trafficking Network in Mozambique, Builds on President Obama's Drug Kingpin Identification*, U.S. Dept. of the Treasury, June 1, 2010, *available at* https://www.treasury.gov/press-center/press-releases/Pages/tg729.aspx.

property within U.S. jurisdiction remain blocked, and he remains prohibited from engaging in virtually all transactions with U.S. persons.[2]

5.      As a result of OFAC's decision to deny Plaintiff's request, and his continued designation as a SDNTK, Mr. Sulemane, his family, and businesses continue to suffer substantial economic harm.

6.      As a result of OFAC's decision to deny Plaintiff's request, and his continued designation as a SDNTK, Mr. Sulemane has suffered irreparable harm to his overall state of health, including irreversible physiological injuries and emotional distress.

7.      As a result of OFAC's decision to deny Plaintiff's request, and his continued designation as a SDNTK, Mr. Sulemane, his family, and businesses continue to experience onerous obstacles in their day-to-day lives, including the expulsion of Plaintiff's son from his educational institution as a direct consequence of Plaintiff's designation, and the tarnishing of his family's reputation within Mozambique.

8.      Through this action, Plaintiff seeks rescission of his designation, blocking notice, and all resulting sanctions, because OFAC's decision to deny Plaintiff's request for reconsideration was the result of arbitrary and capricious agency action based on impermissible documentary evidence and implausible reasoning, and therefore in violation of the Administrative Procedure Act (APA).

9.      OFAC's decision is based solely upon OFAC's peculiar and unsound fact finding expedition, where bits and pieces of already dubious news sources are asserted—often *in*

---

[2] For purposes of the Kingpin Act's implementing regulations, the Foreign Narcotics Kingpin Sanctions Regulations (FNKSR), U.S. persons are defined as any United States citizen or national, permanent resident alien, an entity organized under the laws of the United States (including its foreign branches, or any person within the United States. 31 C.F.R. § 598.318.

*haec verba*—and fallaciously interpreted in order to support the agency's arbitrary conclusions concerning Plaintiff.

10.     In light of the foregoing, Plaintiff hereby files this complaint against Defendants Office of Foreign Assets Control (OFAC), United States Department of the Treasury and Secretary of the Treasury Jacob J. Lew, and petitions this Court to issue a Declaratory Judgment, injunctive relief, and/or writ of mandamus, with respect to OFAC's April 2, 2015 decision to deny Plaintiff's request for reconsideration.

## II.

## JURISDICTION AND VENUE

11.     This action arises under the Kingpin Act, 21 U.S.C. §§ 1901 *et seq.*, and the Administrative Procedure Act, 5 U.S.C. § 701 *et seq*.  This Court has jurisdiction pursuant to 28 U.S.C. § 1331, in that the matter in controversy arises under the laws of the United States, and 28 U.S.C. § 1361 ("The Mandamus Act").

12.     This Court may grant declaratory relief pursuant to the Declaratory Judgment Act, 28 U.S.C. § 2201 *et seq.*, and Fed. R. Civ. P. Rule 57.  This Court may grant injunctive relief pursuant to Fed. R. Civ. P. Rule 65.

13.     Venue lies in the District of Columbia pursuant to 28 U.S.C. § 1391(e) and 5 U.S.C. § 703.

## III.

## PARTIES

14.     Plaintiff Mohamed Bachir Sulemane is a Mozambican businessman who was designated as a Significant Foreign Narcotics Trafficker[3] under the Kingpin Act on or about June 1, 2010, and whose name was included on the Specially Designated Nationals and Blocked Persons List ("SDN List") maintained and administered by OFAC.  Exhibit A attached hereto is a true and accurate copy of the SDN List containing Mr. Sulemane's name and the name of his associated entities.[4]

15.     Plaintiff Mohamed Bachir Sulemane is and was at all times mentioned herein a citizen of the Republic of Mozambique.  Plaintiff is currently residing in Maputo, Mozambique.

16.     Defendant Office of Foreign Assets Control ("OFAC") is a United States federal administrative agency located at the United States Department of the Treasury, 1500 Pennsylvania Ave., NW, Annex, Washington, D.C. 20220.   The United States Department of the Treasury is responsible for the financial and economic security of the United States.   The United States Department of the Treasury is also responsible for overseeing various offices, including OFAC.

17.     Pursuant to the Foreign Narcotics Kingpin Sanctions Regulations (FNKSR), 31 C.F.R. Part 598, the Secretary of Treasury delegated all his authority under the Kingpin Act to the Director of OFAC (*See* 31 C.F.R. § 598.803).   Plaintiff is informed and believes thereon that both the President and OFAC are responsible for making decisions regarding placing persons on, and removing persons from, the SDN List under the

---

[3] PRESS RELEASE, *Treasury Sanctions Entities Owned by Drug Kingpin Mohamed Bachir Suleman Treasury Action Targets Narcotics Trafficking Network in Mozambique, Builds on President Obama's Drug Kingpin Identification*, U.S. Dept. of the Treasury, June 1, 2010, *available at* https://www.treasury.gov/press-center/press-releases/Pages/tg729.aspx.

[4] Counsel has not provided the entire SDN List because the List is over 900 pages.  Counsel has provided the specific page of the SDN List where Plaintiff's name appears.

Kingpin Act (*See* 21 U.S.C. §§ 1904(b) & 1904(e)(1)).   Furthermore, Plaintiff is informed and believes thereon that OFAC and certain other federal agencies are responsible for the provision of appropriate and necessary information that may be relied upon by the President in identifying foreign persons that the President determines are appropriate for sanctions pursuant to the Kingpin Act. *See* 21 U.S.C. § 1903(a).

18.     Defendant Jacob J. Lew is the Secretary of the Treasury of the United States.  Mr. Lew is sued in his official capacity.

## IV.

## REGULATORY AND STATUTORY FRAMEWORK

19.     The Foreign Narcotics Kingpin Designation Act ("Kingpin Act") was designed to "provide authority for the identification of, and application of sanctions on a worldwide basis to, significant foreign narcotics traffickers, their organizations, and the foreign persons who provide support to those significant foreign narcotics traffickers and their organizations, whose activities threaten the national security, foreign policy, and economy of the United States." 21 U.S.C. § 1902.  As such, the Kingpin Act authorizes the President to impose blocking sanctions on "any significant foreign narcotics traffickers publicly identified" in an annual report that the President is mandated to submit to specific Congressional committees, or in additional reports to such committees for any foreign persons identified after the annual report as a significant foreign narcotics trafficker. 21 U.S.C. §§ 1903(b), (h)(1), 1904(b)(1) ("…there are blocked as of such date, and any date thereafter, all such property and interests in property within the United States, or within the possession or control of any United States person…").

20.     The Secretary of the Treasury and the heads of several other federal agencies are entrusted by the Kingpin Act to provide the appropriate and necessary information to

enable the President to submit reports identifying foreign persons as appropriate for sanctions pursuant to the Kingpin Act. 21 U.S.C. § 1903(a).

21.     Moreover, the Kingpin Act provides additional authorities to the Secretary of the Treasury, acting in consultation with the heads of several other federal agencies, including the Drug Enforcement Administration and the Secretary of State, to designate "any foreign person…materially assisting in, or providing financial or technological support for or to, or providing goods or services in support of, the international narcotics trafficking activities of a significant foreign narcotics trafficker"; "any foreign person…owned, controlled, or directed by, or acting for or on behalf of, a significant foreign narcotics trafficker"; and "any foreign person…playing a significant role in international narcotics trafficker." 21 U.S.C. § 1904(b)(2)-(4).  Foreign persons who are so designated are subject to blocking sanctions under the Kingpin Act. 21 U.S.C. § 1904(b).

22.     The Kingpin Act defines the term "narcotics trafficking" as "…any illicit activity to cultivate, produce, manufacture, distribute, sell, finance, or transport narcotic drugs, controlled substances, or listed chemicals, or otherwise endeavor or attempt to do so, or to assist, abet, conspire, or collude with others to do so." 21 U.S.C. § 1907(3). Furthermore, it defines the term "significant foreign narcotics trafficker" to mean, "…any foreign person that plays a significant role in international narcotics trafficking, that the President has determined to be appropriate for sanctions pursuant to [the Kingpin Act]." 21 U.S.C. § 1907(7).

23.     Whenever the President finds that a foreign person that has previously been publicly identified as a significant foreign narcotics trafficker, no longer engages in

narcotics trafficking activities, the President shall issue public notice of such a finding and to certain Congressional committees. 21 U.S.C. § 1903(h)(2).

24.    The Secretary of Treasury also possesses the authority, pursuant to the Kingpin Act to revoke, in consultation with the heads of several other federal agencies, those designations he previously authorized pursuant to 21 U.S.C. § 1904(b)(2)-(4).  21 U.S.C. § 1904(e)(1)(A).

25.    The applicability of sanctions on any foreign person pursuant to the Kingpin Act remain in effect until revoked pursuant to § 1903(h)(2) or § 1904(e)(1)(A). 21 U.S.C. § 1904(a).

26.    On July 5, 2000, OFAC issued the Foreign Narcotics Kingpin Sanctions Regulations (FNKSR), 31 C.F.R. Part 598, to implement the Kingpin Act.  Persons designated pursuant to the Kingpin Act are identified by the FNKSR as specially designated narcotics traffickers (SDNTK). 31 C.F.R. §§ 598.313 & 598.314.

27.    Parties designated as SDNTKs are included on the SDN List maintained and administered by OFAC.

28.    Parties designated pursuant to the Kingpin Act may contest their designation according to procedures established by OFAC. *See* Note 3 to 31 C.F.R. § 598.314.  The procedures governing unblocking and delisting from the SDN List are set forth at 31 C.F.R. § 501.807.  These procedures are applicable to "person[s] blocked under the provisions of any part of this chapter, including a … specially designated narcotics trafficker…" 31 C.F.R. § 501.807(a).

29.    The regulations provide that a blocked person may seek administrative reconsideration of their designation, and thus seek to have the designation rescinded. *See*

31 C.F.R. § 501.807.   Specifically, blocked persons may either submit arguments or evidence that the person believes establishes that insufficient basis exists for the designation, or propose remedial steps on the person's part, such as corporate reorganization, resignation of persons from positions in a blocked entity, or similar steps, which the person believes would negate the basis for designation. *See* 31 C.F.R. § 501.807(a).

30.     The information submitted by the blocked person seeking unblocking is reviewed by OFAC, "which may request clarifying, corroborating, or other additional information." 31 C.F.R. § 501.807(b).   After OFAC has conducted a review of the request for reconsideration, "it will provide a written decision to the blocked person…" 31 C.F.R. § 501.807(d).

31.     Agency actions made reviewable by statute and final agency actions for which there is no other adequate remedy in a court are subject to judicial review. 5 U.S.C. § 704. Furthermore, pursuant to the Administrative Procedure Act, "[e]xcept as otherwise required by statute, agency action otherwise final is final for the purposes of [being subject to judicial review under the APA] whether or not there has been presented or determined an application for a declaratory order, for any form of reconsideration, or, unless the agency otherwise requires by rule and provides that the action meanwhile is inoperative, for an appeal to superior agency authority." 5 U.S.C. § 704.

32.     The APA instructs that to the extent necessary to decision and when presented, the reviewing court shall decide all relevant questions of law, interpret constitutional and statutory provisions, and determine the meaning or applicability of the terms of an agency action. 5 U.S.C. § 706.

33.     The APA mandates that a reviewing court shall hold unlawful and set aside agency action, findings, and conclusions found to be arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law. *See* 5 U.S.C. §706(2)(A).

34.     The APA also mandates that a reviewing court shall hold unlawful and set aside agency action, findings, and conclusions found to be without observance of procedure required by law. *See* 5 U.S.C. §706(2)(D).

**V.**

**FACTUAL AND PROCEDURAL BACKGROUND**

A.      **Initial Designation of Plaintiff as a Significant Foreign Narcotics Trafficker and the Three Associated Businesses as Specially Designated Narcotics Traffickers**

35.     On June 1, 2010, President Obama identified Mohamed Bachir Sulemane, the Plaintiff, as a significant foreign narcotics trafficker appropriate for sanctions under the Kingpin Act.[5] On the same day, OFAC added Plaintiff to the Specially Designated Nationals and Blocked Persons (SDN) List as a Specially Designated Narcotics Trafficker (SDNTK),[6] and imposed blocking sanctions on Plaintiff, including a block on all his property and interests in property within U.S. jurisdiction.

36.     Concurrent with Plaintiff's designation, OFAC designated three businesses associated with Plaintiff, including Grupo MBS Limitada, Grupo MBS-Kayum Centre, and Maputo Shopping Centre, as Specially Designated Narcotics Traffickers.  These businesses were designated for being owned or controlled by the Plaintiff.[7]

---

[5] *See supra* note 1.
[6] U.S. Department of the Treasury, *Recent OFAC Actions*, June 1, 2010, *available at* https://www.treasury.gov/resource-center/sanctions/OFAC-Enforcement/Pages/20100601.aspx.
[7] *See supra* note 1.

37.     These designations imposed blocking sanctions on Plaintiff and the three associated businesses, including a block on all of their property and interests in property within U.S. jurisdiction.

38.     OFAC's designation action caused Plaintiff, his family, and businesses substantial economic harm.

**B.     Plaintiff and the Three Associated Businesses' Request for Reconsideration of their Designations Pursuant to 31 C.F.R. § 501.807**

39.     Prior to filing the formal request, on August 18, 2010, Plaintiff submitted a settlement offer that proposed several remedial steps to the agency, in accordance with the delisting criteria set forth in 31 C.F.R. § 501.807.

40.     Although OFAC acknowledged Plaintiff's settlement offer on September 29, 2010, it requested Plaintiff to file a formal petition for his removal pursuant to 31 C.F.R. § 501.807 in order to proceed with the reconsideration process.  In the same letter, OFAC stated that Plaintiff's offer to cooperate with the agency would be considered in its final determination of the reconsideration petition.  A copy of OFAC's Evidentiary Memorandum for the agency's decision to deny Mohamed Bachir Sulemane and the three associated businesses request for reconsideration to be removed from the SDN List ("Denial Memorandum") is attached hereto as Exhibit B.[8] *See* Exhibit B, MBSDenial 005.

41.     On November 30, 2010, Plaintiff filed a formal request for reconsideration of his designation pursuant to 31 C.F.R. § 501.807.  In line with the delisting criteria outline in that section, the request included arguments and evidence affirming that an insufficient

---

[8] OFAC's Evidentiary Memorandum has over 760 pages of exhibits. Due to the significant size of such exhibits, and in an effort to promote judicial economy, Counsel has only attached those exhibits of OFAC's Evidentiary Memorandum that it believes are essential to the claims made.

basis existed for the designations, and to the extent that a credible basis existed for the designations, Plaintiff proposed remedial steps to negate such bases for the designations. *See* Exhibit B, MBSDenial 005.

42.     During the nearly four (4) and a half year period in which the request for reconsideration was pending, Plaintiff made numerous submissions to OFAC evidencing that an insufficient basis existed for both the initial designation and for the continued designation.  *See* Exhibit B, MBSDenial 005-007.

43.     During that period, OFAC failed to provide Plaintiff with a copy of the administrative record underlying the designations.   Further, OFAC's only substantive correspondence with Plaintiff was limited to two (2) questionnaires.    These questionnaires—issued on March 2, 2011 and March 6, 2012, respectively—requested Plaintiff to provide certain information relevant to OFAC's consideration of Plaintiff's request for reconsideration.

44.     Plaintiff made his final submission to OFAC on February 7, 2015, requesting a status update on the petition and seeking the agency's guidance as to what information was necessary for a final decision to be made on his request for reconsideration after years of inaction by OFAC.  In the same submission, Plaintiff also requested a copy of the unclassified portions of the administrative record, so that he could have a meaningful opportunity to respond to OFAC's designation. *See* Exhibit B, MBSDenial 007.

**C.     OFAC's Wrongful and Improper Denial of the Request for Reconsideration**

45.     On April 2, 2015, OFAC denied Plaintiff's request for reconsideration.  In doing so, OFAC concluded that Plaintiff "continue[s] to meet the criteria under the Kingpin Act."   Specifically, OFAC held that after reviewing all of the evidence before it,

including law enforcement sensitive, diplomatic, classified, and open source information, it didn't "find Mr. Sulemane's claims that he has not engaged in narcotics trafficking to be credible," and that "[m]ultiple sources indicate that he has engaged, and continues to engage, in narcotics trafficking."

46.     In the same April 2, 2015 denial letter, OFAC stated that it would shortly thereafter provide Plaintiff with a copy of the unclassified, non-privileged portions of the administrative record OFAC relied upon in denying Mr. Sulemane's request.  OFAC also stated that it would provide Plaintiff with a copy of the unclassified, non-privileged portions of OFAC's administrative record from 2010 supporting the initial Tier 1 Kingpin identification, and those of the three associated businesses as SDNTKs, claiming, "almost all of which you have previously received."

47.     As evidenced by OFAC's own chronology of correspondence, OFAC was mistaken in making such a claim, since during the course of the nearly four (4) and a half year long reconsideration period, Plaintiff had not received any such portions of OFAC's administrative record pertaining to his designation, and only diminutive information pertaining to the three associated businesses' designations. *See* Exhibit B, MBSDenial 005-007.

48.     It was not until August 18, 2015, over four (4) months after OFAC's April 2, 2015 denial letter, that the agency finally provided Plaintiff with the unclassified, non-privileged portions of the administrative records that it had relied upon in both the initial designations, as well as in its denial of Plaintiff's request for reconsideration.  The disclosed administrative record was comprised of the Evidentiary Memorandum for the

Tier I designation of Mohamed Bachir Sulemane, the Evidentiary Memorandum for the Tier II designations of the three associated businesses, and the Denial Memorandum.

49.    OFAC's Denial Memorandum supporting its decision to deny Plaintiff and the three associated businesses' request for reconsideration is the only information provided to Plaintiff that offers a statement of reasons for the agency's April 2, 2015 denial decision.  OFAC's Denial Memorandum was heavily redacted, and included redactions of numerous portions that were otherwise marked as unclassified.

50.    On November 23, 2015, Plaintiff submitted a request for the full-disclosure of the redacted, but marked unclassified, portions of the administrative record, or alternatively an explanation from the agency as to why such portions were redacted.  On May 2, 2016 OFAC responded to Plaintiff's request, acknowledging Plaintiff's questioning of OFAC's redaction of a number of paragraphs and documents in the administrative record, and providing updated copies of the administrative record that included additional information and their related exhibits.   Therefore, all references hereinafter to the Evidentiary Memorandum for the Tier I designation of Mohamed Bachir Sulemane, the Evidentiary Memorandum for the Tier II designations of the three associated businesses, or the Denial Memorandum, are to the May 2, 2016 updated copies of the administrative record.

51.    OFAC's Denial Memorandum cited to five (5) general considerations.  OFAC indicated that these considerations were in response to five (5) categories of arguments and claims it believed Plaintiff had submitted throughout the reconsideration process.

52.    OFAC's Denial Memorandum claimed that Plaintiff had put forth the following arguments challenging the designations: 1) that Plaintiff had never been involved in

narcotics trafficking and has had no financial relations with narcotics traffickers; 2) that Plaintiff and the three allegedly associated businesses had never been involved in any money laundering activity; 3) that the Maputo Shopping Centre is owned by Plaintiff's sons and wife; 4) that certain September 2011 violations announced by the Government of Mozambique against Plaintiff are unrelated to narcotics trafficking; and 5) that Plaintiff proposed to OFAC several remedial steps in exchange for his removal and the removal of the three associated businesses from the SDN List.   Within the Denial Memorandum, OFAC provided its assessment of each of these five (5) arguments.

> **i.   OFAC's conclusion that Mr. Sulemane is involved in narcotics trafficking, to include financial dealings and relations with persons engaged in narcotics trafficking**

53.    In its attempt to counter Plaintiff's contention that he was not involved in narcotics trafficking and had no financial relations with narcotics traffickers, OFAC claimed that its "…evidence indicates that from at least after the June 1, 2010 identification up until at least [REDACTED IN FULL], Sulemane has distributed, sold, financed, or transported narcotics drugs, to include assisting, abetting, conspiring, or colluding with others to do so."   *See* Exhibit B, MBSDenial 009.

54.    In support of this allegation OFAC cited and provided 1) a blog post from *Macau Blogs* dated June 2, 2010; 2) a newspaper article from the *Mumbai Mirror* published in November 2014, and 3) reports in two Portuguese news reports called the *Savana* and *Verdade* that otherwise predominately rely upon the *Mumbai Mirror* article for their own reporting.   All other evidence in support of OFAC's position was redacted, apparently due to its classified, sensitive, or in some instances, unclassified nature.   *See* Exhibit B, MBSDenial 419-424 and 766-772.

55.    The *Macau Blog*s blog post is dated only a day after the identification of Plaintiff on June 1, 2010.   The blog post provided by OFAC in English, which is titled, "Mozambique: Article Urges Government Request U.S. Info on 'Drug Baron'," indicates that it was originally in Portuguese.   This English translated version, which does not specify as to whether it is an official translation, reads in the first person narrative.   It does not state who the narrator is, nor provide any credentials for the blog post's author. OFAC claims it found the blog post on the Internet. *See* Exhibit B, MBSDenial 419-424.

56.    OFAC's assessment of the *Macau Blogs* blog post cites to its allegation that Plaintiff, "…continued to run up successes that were not based on clean business deals but on drugs-connected dealings."   In order to support this contention, OFAC directly cites to several other allegations within the blog post.   However, no reference is made within the article itself or independently by OFAC to corroborate such allegations.   The narrator simply makes certain claims against Plaintiff without any references to support them, or any statement of his own credentials to bolster his credibility in making such claims.   Furthermore, as OFAC itself states *Macau Blogs* is an "Internet blog."   However, that blog site is no longer available online, there is no record of such a blog site ever having existed on the Internet, and no hyperlink to the site was provided by OFAC. *See* Exhibit B, MBSDenial 9 and 419-424.

57.    There is also no information within the *Macau Blogs* blog post, or in OFAC assessment of it, as to how any of the allegations against Plaintiff support OFAC's contention that Plaintiff has *continued* to be involved in narcotics trafficking since his initial designation.   Rather, the blog post appeared one day after Plaintiff's designation

(June 1, 2010) and was reporting on Plaintiff's initial identification as a significant foreign narcotics trafficker by the President, not any events that occurred thereafter.

58.    The *Mumbai Mirror* article relied upon by OFAC claims that Plaintiff is the archrival of either Vivek Goswami (whose arrest appears to be the subject of the article) or Barkat Akaash (whose arrest and friendship with Goswami the article discusses), and that in light of this rivalry, Plaintiff set out his men to eliminate one such individual.   It cannot be discerned from a plain reading of the article which of these individuals is being referred to as Plaintiff's alleged archrival.   The article further claims that Plaintiff was "already in touch with Dawood [Ibrahim], who also wanted to take Goswami out of the equation."   This article—which is primarily concerned with the arrest of Goswami, following a tip-off from Dawood Ibrahim, another SDNTK—makes no other mention of the Plaintiff.   Furthermore, there are no dates cited by the article for when any of these alleged acts involving Plaintiff occurred, nor is there any suggestion as to how such relationships between any of the individuals mentioned in the article relate to Plaintiff's involvement in narcotics trafficking. *See* Exhibit B, MBSDenial 766-772.

59.    OFAC interprets this article to mean that Plaintiff and Vivek Goswami, "…'an international drug lord' arrested in Kenya in November 2014, are 'arch rival[s]'…" Further, OFAC claims that the article describes Plaintiff as having sent his men to "…'eliminate' Goswami…," and as being already "…in touch with Dawood Ibrahim who sought the same."   OFAC's interpretation of the article goes on to claim that Dawood Ibrahim "…'and company' tipped off the Kenyan police who passed on the information to the DEA…" and that in a joint operation, "…Goswami and others were

arrested in Kenya and charged with conspiring to traffic narcotics in the U.S. and Kenya." *See* Exhibit B, MBSDenial 014.

60.     The article itself does not provide any evidence to support OFAC's conclusion that Plaintiff continues to be involved in narcotics trafficking, and is otherwise unreliable and deficient in its reporting because it has no corroborating dates for Mr. Sulemane's alleged conduct, and does not specify which of the reported persons performed, or were the victim, of any of the alleged acts.   Furthermore, OFAC misinterprets the article in supporting its conclusion because it assumes that Plaintiff engaged in certain alleged conduct where the article itself fails to specify the reported actors or victims.   The interpretation appears to read that Plaintiff is a drug lord because he is the "archrival" of an "international drug lord," and that Plaintiff is part of Dawood Ibrahim's "company," which ordered the elimination of Plaintiff's rival, by tipping off law enforcement leading to the rival's arrest.

61.     The article does not describe the nature of the Plaintiff-Goswami rivalry, and although it does refer to Goswami as an international drug lord, it does not apply the same characterization to the Plaintiff.   Further, there is no mention of Plaintiff's involvement in any activity that would fall within the definition of narcotics trafficking contained in the Kingpin Act. See 21 U.S.C. § 1907(3).   As such, the article fails to support OFAC's conclusion that Plaintiff continues to be engaged in narcotics trafficking.

62.     Also in support of its conclusion that Plaintiff continues to be engaged in narcotics trafficking, OFAC's Denial Memorandum states that "[o]pen source reporting noted that [Plaintiff's] kidnapping in November 2014 in Maputo was reportedly linked to the arrest of four prominent drug traffickers in Kenya, according to Portuguese language

news articles in *Savan* and *Verdade,* [REDACTED IN FULL]." OFAC only provided the English translated version of these news reports, which do not appear to be an official translation.

63.     Both the *Savan* and *Verdade* reports were primarily concerned with the kidnapping of Plaintiff that occurred in November 2014. OFAC's interpretation of the *Verdade* report, reported by Luis Nhanchote, claims that according to *Verdade*, "…there are reports from the Kenyan and Indian media outlets of *indirect connections* between [Mr. Sulemane] and the detention of four individuals on charges of alleged heroin trafficking and the confiscation of heroin in Mombasa, Kenya." (emphasis added) OFAC notes that such reports from the Kenyan and Indian media outlets "…were not specified by *Verdade* and could not be located by OFAC." Thus, OFAC takes these specific assertions in the *Verdade* report *in haec verba,* without any assessment of the reliability of such reporting. *See* Exhibit B, MBSDenial 014 and 763-765.

64.     OFAC's interpretation of the *Verdade* references the report's claim, which itself cites to "Kenyan media" for support, that, "[t]he four individuals detained in Kenya are Vicky Goswami, Baktash Abdallah, Ibrahim Abdallah, and Kulam Hussein," that "Vicky Goswami was a former partner of Dawood [Ibrahim]," and that "Goswami served a prison sentence in Dubai for drug trafficking before returning to Kenya where he began working with Baktash Abdallah and Ibrahim Abdallah to traffic drugs." Again here, there is no assessment by OFAC as to the reliability of the "Kenyan media" reporting that the *Verdade* refers to.

65.     Finally, OFAC's interpretation of the *Verdade* references the report's own citation to Nazia Sayed's November 16, 2014, *Mumbai Mirror* article, to support the claim that,

"…[Mr. Sulemane"] had ordered the elimination' of Goswami and relied on [Ibrahim's] support to do so."  Within the same assessment, OFAC also references the *Savana* report, which itself states it is an "[u]nattributed report," and OFAC references the reports own citation to the *Mumbai Mirror* article that calls Plaintiff "another African drug baron." Finally, OFAC references the *Savana* report claiming Plaintiff "…as a drug underworld rival of the four detained traffickers." *See* Exhibit B, MBSDenial 014 and 761-765.

### ii. OFAC's conclusion that Mr. Sulemane is involved in narcotics-related money laundering activities

66.    In countering Plaintiff's second contention—that he was not involved in narcotics-related money laundering activities—OFAC provided Plaintiff with only two pieces of evidence.  Such evidence consisted of two news articles, the first from *Africa Monitor*, dated July 6, 2010, and the other from the *The Mail & Guardian*, dated March 23, 2011, both of which summarized statements made by third-parties.   All other evidence in support of OFAC's position was redacted. *See* Exhibit B, MBSDenial 015, 431-434, and 625-628.

67.    The first news article relied upon by OFAC to support its conclusion that Plaintiff's disavowal of money laundering is not credible, and that he continues to be involved in narcotics-related money laundering activities, is a weekly newsletter by *Africa Monitor*, that was dated July 6, 2010, only a month and five (5) days after Plaintiff's identification by OFAC.  The article itself states that it was originally in Portuguese.  The English translated version (the only version provided by OFAC), does not appear to be an official translation and is poorly translated. *See* Exhibit B, MBSDenial 015 and 431-434.

68.     The relevant portion of the *Africa Monitor* article that OFAC relies upon claims that based upon information disclosed by sources close to Plaintiff "…(relatives) suggests that [Mr. Sulemane] denies he has ever been directly involved in drug trafficking. According to that article, he admits, however, and without any reservations being involved in money laundering operations through the importation of household appliances and electronic equipment from Arab producers (the profits were eventually shared with an organization of an irregular and clandestine nature)."  However, Plaintiff has never admitted or otherwise stated to the effect, either explicitly or by implication, that he has been involved in money laundering operations of any nature, whatsoever. Neither OFAC's assessment of the article, nor the article itself, substantiate such an admission by Plaintiff.  Thus, the claim advanced by the article is false. *See* Exhibit B, MBSDenial 015 and 431-434.

69.     OFAC's interpretation of the *Africa Monitor* article is not in line with the claims made by the article itself.  Specifically, OFAC's interpretation alleges that Plaintiff's relatives suggest that Plaintiff admits to being involved in money laundering operations, whereas the article itself alleges that Plaintiff himself had admitted such involvement. Either way, neither the article nor OFAC's interpretation provide any assessment of the reliability of such admissions.  Further, OFAC's interpretation claims that the sources cited to by the article (*i.e.* Plaintiff's relatives) allege that Plaintiff denies he has ever been directly involved in narcotics trafficking, and OFAC discredits this claim "…given all the available evidence."  It is important to note that this interpretation by OFAC was used in its support of the conclusion that Plaintiff is in involved in narcotics-related

money laundering activities, and not for the conclusion that Plaintiff is involved in narcotics trafficking. *See* Exhibit B, MBSDenial 015 and 431-434.

70.     The relevant portion of *The Mail & Guardian* article that OFAC relies upon claims that Luis Nhachote, a purported anti-corruption campaigner, "says he believes [Mr. Sulemane] has laundered money."   The article also included Mr. Nhachote's statements that sometime around 2008 (prior to Plaintiff's designation), after having investigated Plaintiff's activities, he found no evidence that Plaintiff was involved in money laundering.   The article further describes that although Luis Nhachote, "…renewed his investigations…" subsequent to Plaintiff's designation, "…all he has been able to establish so far is that it is difficult to figure out how [Mr. Sulemane], who is in his fifties, was able to build a fortune…" and that "…he does not expect [Mr. Sulemane] to ever be brought to trial in Mozambique, because hearings might expose high level collaborators in government and politics." *See* Exhibit B, MBSDenial 625-628.

71.     OFAC's summary of the article, first cites to Luis Nhachote's belief that Mr. Plaintiff has laundered money, and then references the news article as if the citation to a news source alone substantiates the claim.   However, there was no assessment by either OFAC, or the news article itself, to verify the reliability of Mr. Nhachote's claims of money laundering against Plaintiff. *See* Exhibit B, MBS Denial 015.

72.     OFAC's summary ultimately conceded that Mr. Nhachote was unable to find evidence linking Plaintiff to drug trafficking, but reiterated Mr. Nhachote's claim that he does not expect Plaintiff to be brought to trial in Mozambique because it might expose high-level collaborators in Mozambique's government.   This reiteration of Mr. Nhachote's claim concerning Plaintiff being brought to trial in Mozambique, has no

bearing on OFAC's conclusion that Plaintiff is involved in narcotics-related money laundering activities.   Furthermore, OFAC provided no other evidence in the Denial Memorandum to indicate how such a claim by Mr. Nhachote supports its conclusion. Indeed, it appears that OFAC, at best, has chosen to rely upon an individual's suspicions—suspicions which the individual's own multiple investigations were unable to confirm—rather than any actual evidence uncovered by that individual.

> ### iii. OFAC's conclusion that Grupo MBS Limitada, Grupo MBS-Kayum Centre, and Maputo Shopping Centre continue to be owned, controlled, directed by Mr. Sulemane, and that the Maputo Shopping Centre continues to be materially assisting in, or providing goods or services in support of, the narcotics trafficking activities of Mr. Sulemane

73.     OFAC denied Plaintiff's third contention—that he no longer owns, controls, or directs the Maputo Shopping Centre—one of the three associated businesses that were designated, and alleged that the entity continues to be materially assisting in, or providing goods or services in support of, narcotics trafficking activities.   However, no evidence or arguments were provided by OFAC in the Denial Memorandum in support of this allegation.

74.     In addition to wholly-discounting Plaintiff's submissions evidencing his legal transfer of ownership interest in the Maputo Shopping Centre and his severed ties with the business, OFAC went on to conclude that Plaintiff not only owns, controls or directs the business, but also uses it to materially assist in, or provide goods or services in support of, his narcotics trafficking activities.   The Denial Memorandum provided to Plaintiff has fully redacted all such information, and thus Plaintiff is unable to discern in

what specific manner OFAC believes that he uses Maputo Shopping Centre for such purposes. *See* Exhibit B, MBSDenial 015-018.

75. For these reasons, Plaintiff is unable to discern OFAC's basis for believing that Plaintiff is utilizing Maputo Shopping Centre for carrying out narcotics trafficking activities.

> ### iv.  OFAC's conclusion that the September 2011 violations announcement by the Government of Mozambique are related to Mr. Sulemane's involvement in narcotics trafficking

76. Plaintiff's submissions to OFAC dated December 6, 2011 and January 17, 2012, indicated that the alleged September 2011 violations of Mozambique's customs procedures, foreign exchange regulations, and tax evasion, announced by the Government of Mozambique, were unrelated to narcotics trafficking. Indeed, Mozambique's Government itself, having investigated the matter, concluded that there was insufficient evidence to link these violations to narcotics trafficking. In fact, one of the articles relied upon by OFAC, from the *Lusa*, to illustrate that sufficient evidence resulted from the Mozambique Attorney General's Office that a breach of procedures related to customs procedures by Plaintiff and his companies had occurred, was itself concerned with how an insufficient amount of evidence existed linking Plaintiff to drug trafficking. In relevant part, the article discussed how the Attorney General's Office of Mozambique had stated that, "…after an investigation that was carried out in collaboration with Interpol and the United Kingdom, the United States, Portugal, and South Africa, it had not been possible to confirm [Plaintiff's links to drug trafficking]." *See* Exhibit B, MBSDenial 018-022, 425-426.

77.     On March 6, 2012, OFAC requested that Plaintiff provide certain customs and tax records[9] from the Mozambique Customs Service and Revenue Authority of Merchandise related to goods imported by Plaintiff and the three associated entities. Plaintiff promptly furnished these records in his June 4, 2012 submission. OFAC's stated purpose for this request was to verify whether Plaintiff was complying with customs and tax regulations of Mozambique following the September 2, 2011 charges by Mozambique's Office of the Prosecutor General, so that they could determine the veracity of Plaintiff's claims that he was in compliance with customs laws and protocols in Mozambique.

78.     Nevertheless, OFAC claimed in its Denial Memorandum that "[a]lthough it appears that [Mr. Sulemane] is complying with Mozambique's customs and tax laws since his June 1, 2010 identification based on the records he provided to OFAC, OFAC is unable to determine whether these documents are authentic and complete."  OFAC gave no reason as to why it was unable to determine the authenticity or completeness of the documents Plaintiff provided, or any indication that it attempted to determine such. Further, OFAC did not describe why they suspected these documents to be something other than authentic and complete. *See* Exhibit B, MBSDenial 019-020 (footnotes 30-31). Finally, it is unclear why OFAC would request certain records that they would be unable to determine the authenticity and completeness of.

79.     In denying Plaintiff's fourth contention, OFAC held that it had reason to believe that Plaintiff's violations of customs procedures, foreign exchange regulations, and tax evasion are related to his involvement in narcotics trafficking.  OFAC argued that not all of Plaintiff's imported merchandise are scanned and inspected in Mozambique, and that he does not always comply with import and customs procedures in Mozambique,

---

[9] The requested records were those dated from September 2, 2011 to March 6, 2012.

contrary to his claims that all of his cargo was electronically scanned before delivery to him and/or his companies.   OFAC also claimed that despite the Mozambique Government's conclusion that insufficient evidence existed to link the September 2011 allegations against Plaintiff to narcotics trafficking, that Plaintiff does indeed traffic, and continues to traffic, in narcotics.   Finally, OFAC indicated that the Mozambique Government is hampered by corruption, and thus, the Mozambique Government's conclusion did not negate the "significant evidence" of Plaintiff's involvement in narcotics trafficking. *See* Exhibit B, MBSDenial 018-022.

80.      The only evidence OFAC provides to support these beliefs is the same June 2, 2010 Internet blog posting by *Macau Blogs*, discussed above.[10] *See* Exhibit B, MBSDenial 020-021 and 419-424.

81.      Neither OFAC's interpretation of the *Macau Blogs* post, nor the blog post itself, provide any basis to support OFAC's conclusion that "[t]he September 2011 violations announcement by the Government of Mozambique are related to [Plaintiff's] involvement in narcotics trafficking.  OFAC affirms its conclusion without providing any independent evidence to corroborate its claim in support of such a conclusion.  Moreover, without such evidence, customs and import violations are not in and of themselves necessary for involvement in narcotics trafficking or related activities.   Finally, the *Macau Blogs* article's publication date, June 2, 2010, precedes the September 2011 violations announcement by over a year.

---

[10] The *Macau Blogs* blog post claimed that Mr. Sulemane's trucks contained imports that were not inspected or scanned, and that, "many high ranking officials in…the Customs Department, PRM [Republic of Mozambique Police], and the Ministry of Finance took advantage of the MBS's narcotics-related generosity to build their own fortunes…"

  **v. OFAC's conclusion that Mr. Sulemane's settlement offer or remedial steps are insufficient to warrant the removal of his name, and that of the three companies, from the SDN List**

82. Finally, OFAC rejected Plaintiff's settlement offer stating that the offer, and any remedial steps being proposed as part of that offer, are insufficient to warrant the removal of his name, and that of the three associated companies, from the SDN List. *See* Exhibit B, MBSDenial 022-024.

83. In a November 30, 2010 submission to OFAC, Plaintiff proposed establishment of an OFAC compliance program for his businesses, and to cooperate with OFAC and the U.S. Government in any manner required to have his designation rescinded. *See* Exhibit B, MBSDenial 034-039. Previously, in an August 18, 2010 submission to OFAC, Plaintiff had proposed the following remedial steps in exchange for the removal of his and the three associated businesses' designations: 1) provision of full cooperation with U.S. federal agents in any investigation of the businesses or himself; 2) access to U.S. federal agents for inspection of all property and assets of the designated parties; 3) access to U.S. federal agents to inspect all financial and business records; 4) implementation of an OFAC compliance program for all his businesses; and 5) undertaking any other steps the U.S. Government would require of him. In a letter dated May 30, 2011, Plaintiff had reiterated his willingness to cooperate in whatever manner deemed necessary by OFAC, and that he was prepared to debrief U.S. Government officials and allow access to all property which he owned in Mozambique so that the U.S. Government could carry out its investigation.

84. Again on February 7, 2015, Plaintiff requested to enter into a settlement agreement with OFAC, similar in nature to one that OFAC previously executed with

another former SDN, wherein Plaintiff would agree to all appropriate terms and conditions necessary for negating the basis of the SDNTK designation.  If OFAC could not enter into such an agreement, Plaintiff respectfully requested a reasoned explanation as to OFAC's decision.  OFAC failed to respond to Plaintiff's February 7, 2015 request prior to the denial.

85.     As evidenced by the Denial Memorandum, OFAC determined that Plaintiff's "offer of cooperation is a façade meant to cover up his narcotics trafficking activities and he continues to meet the criteria as an [SDNTK] under the Kingpin Act."  *See* Exhibit B, MBSDenial 023.

86.     OFAC did not provide any arguments or evidence as to why such offers of cooperation were deemed a façade and there is nothing in the administrative record to suggest that it was.  In addition, OFAC reasoned that, "…the remedial steps outlined by [Mr. Sulemane] serve as a condition for his removal from the SDN List—as opposed to steps already put in place," and that his removal, "…could be considered after such remedial steps are implemented, but more importantly, when Sulemane ceases playing a significant role in international narcotics trafficking."

87.     OFAC's conclusion that the offers of cooperation were a façade was conclusory, as the agency failed to provide any explanation as to why they believe the remedial offer of cooperation to be a façade meant to cover up any purported narcotics trafficking activities by Plaintiff.  Plaintiff's remedial offer was made pursuant to OFAC's own procedures governing delisting whereby an SDNTK may propose remedial steps on their part, "which the person believes *would* negate the basis for designation."  31 C.F.R. § 501.807 (emphasis added).  OFAC never conveyed to Plaintiff during the reconsideration

process that such remedial steps were to be performed prior to their consideration by the agency, and there is no evidence in the Denial Memorandum provided to Plaintiff to suggest that the remedial offers were otherwise made in bad faith (*i.e.* as a "façade"). Nor is it clear from the language of 31 C.F.R. § 501.807 that proposed remedial measures are to be implemented prior to their consideration.

88.     Furthermore, OFAC considered the several offers by Mr. Sulemane to provide access to OFAC to his and the associated businesses' properties, assets, and financial and business records, as both costly and unnecessary given that similar investigative efforts had been undertaken through written correspondence.  However, as noted above, the only time that OFAC had requested such records from Plaintiff was in OFAC's March 6, 2012 request, and despite having received the requested documents from Plaintiff, OFAC claimed it was unable to verify them as authentic and complete.

89.     For these reasons, OFAC's characterization of Mr. Sulemane's settlement offer and remedial steps as "insufficient" to warrant the removal of his name from the SDN List, failed to consider that they were proposed in line with OFAC's own agency procedures governing SDN delistings.

> **vi. OFAC's conclusion that Mr. Sulemane continues to meet the criteria of a significant foreign narcotics trafficker pursuant to the Kingpin Act**

90.     OFAC's response to what they believe to be Plaintiff's five (5) contentions for removal, concluded that Plaintiff continues to meet the criteria of a significant foreign narcotics trafficker pursuant to the Kingpin Act, and that "[S]ulemane's request for the removal of his name, and that of the three companies, should be denied and they should remain on the SDN List." *See* Exhibit B, MBSDenial 24-25.

91.     On April 2, 2015 OFAC formally denied Plaintiff's request for reconsideration of his identification as a SDNTK and the removal of his designation from the SDN List.

92.     As a result of this wrongful decision to deny Plaintiff's reconsideration request and to continue his designation, Plaintiff continues to suffer irreparable financial harm.

93.     On November 23, 2015, Plaintiff submitted a request for the full disclosure of certain portions of the administrative record that appeared to be marked unclassified but were redacted, and to otherwise understand why portions that weren't marked as classified were redacted by OFAC.  In denying Plaintiff's request for reconsideration, the Denial Memorandum claimed that its decision was based on substantial evidence derived from law enforcement, classified, open sources categories that were predominately redacted.  However, the totality of evidence OFAC disclosed to Plaintiff in support of the denial consisted of two (2) irrelevant and immaterial news articles and its interpretation of a blog post, of which the corresponding exhibit was fully redacted.  OFAC discounted the veracity of the evidence and arguments that Plaintiff submitted, without providing sufficient reasoning.  OFAC's conclusion that Plaintiff continues to meet the criteria of a significant foreign narcotics trafficker pursuant to the Kingpin Act, in order to deny his request for reconsideration, is unsupported by a rational basis.

**VI.**

**CAUSES OF ACTION**

**COUNT I – OFAC'S CONCLUSION THAT MOHAMED BACHIR SULEMANE CONTINUES TO BE INVOLVED IN NARCOTICS TRAFFICKING IS ARBITRARY AND CAPRICIOUS ACTION UNDER THE APA**

94.     Plaintiff re-alleges and fully incorporates by reference the allegations in paragraphs 1-93 above.

95.     OFAC's decision to continue Plaintiff's designation as an SDNTK after the formal filing of his reconsideration request pursuant to 31 C.F.R. § 501.807, constitutes "final agency action" under 5 U.S.C. § 704.

96.     The court may hold unlawful and set aside agency action, findings, and conclusions found to be "…arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law…" 5 U.S.C. § 706(2)(A).

97.     OFAC's assessment of the evidence relied upon to support its conclusion that Plaintiff continues to be involved in narcotics trafficking since June 1, 2010—to include financial dealings and relations with narcotics traffickers—is unreasonable.

98.     OFAC's reliance on an unofficial English translation blog post from the *Macau Blog*, dated only a day after Plaintiff's identification as an SDNTK, to support its conclusion that Plaintiff continues to be involved in narcotics trafficking since at least the time of his identification—to include financial dealings and relations with narcotics traffickers—is unreasonable.

99.     There is nothing in the blog post itself nor in OFAC's assessment of the blog post to suggest that Plaintiff continued to be involved in narcotics trafficking within that one day time frame between his identification and the publication of the *Macau Blog* post, or more specifically, "from at least after the June 1, 2010 identification up until [OFAC's Denial]," as OFAC concluded.

100.    OFAC's assessment quotes from the post that "[Plaintiff] continued to run up successes that were not based on clean business deals but on drugs-connected dealings," as if to imply that such "successes" occurred during the one day between the June 1, 2010 designation and the June 2, 2010 blog post publication.  However, there is nothing stated

within the post itself nor in OFAC's assessment indicating or otherwise suggesting that such conduct occurred within that one-day time frame.  Therefore, to the extent that OFAC's conclusion relied upon the *Macau Blog* post, it is arbitrary and capricious agency action, and should be set aside by this Court.

101.    OFAC's interpretation of the *Mumbai Mirror* article, dated November 16, 2014, runs counter to what is actually reported by the article, and is an unreasonable interpretation of the article's contents.

102.    Comparing the November 16, 2014 article with OFAC's interpretation of that article shows that OFAC's understanding of the article is incorrect.  Nevertheless, neither the original article itself, nor OFAC's interpretation of the article support the agency's conclusion that Mr. Sulemane is involved in narcotics trafficking activities.  OFAC's supporting evidence and interpretation of such evidence fails to provide a satisfactory explanation for its conclusion, as there is no rational connection between the facts found and the conclusion that Mr. Sulemane continues to be involved in narcotics trafficking. Therefore, to the extent that OFAC's conclusion relied upon the *Mumbai Mirror* article, it is arbitrary and capricious agency action and should be set aside by this Court.

103.    OFAC's reliance on the *Savana* report is unreasonable for the same reasons as the *Mumbai Mirror* article, which the report refers to in their claims against Plaintiff, and which OFAC interprets in its assessment.  OFAC's interpretation of the *Savana* report provides no new information and otherwise recites the same allegations made in the *Mumbai Mirror* article.  Therefore, to the extent that OFAC's conclusion relied upon the *Savana* report, it is arbitrary and capricious agency action and should be set aside by this Court.

104.    Finally, OFAC's reliance on the *Verdade* report is unreasonable both for the same

reasons as the *Mumbai Mirror* article, since OFAC's interpretation references the

*Verdade* report's discussion of the same *Mumbai Mirror* article, and because OFAC itself

states that it could not locate the *Verdade* report's other "media outlets" claims'

pertaining to Plaintiff, which are otherwise limited to assertions that "indirect

connections" exist between Plaintiff and the detention of four individuals on charges of

narcotics trafficking activities.   OFAC's assessment of the *Verdade* report fails to

indicate how such "indirect connections" support its conclusion that Plaintiff continues to

be involved in narcotics trafficking. Therefore, to the extent that OFAC's conclusion

relied upon the *Verdade* report, it is arbitrary and capricious agency action and should be

set aside by this Court.

105.    Therefore, OFAC's conclusion is the result of arbitrary and capricious agency

action, and should be set aside by this Court.

## COUNT II– OFAC'S CONCLUSION THAT MOHAMED BACHIR SULEMANE IS INVOLVED IN NARCOTICS-RELATED MONEY LAUNDERING ACTIVITIES IS ARBITRARY AND CAPRICIOUS ACTION UNDER THE APA

106.    Plaintiffs re-allege and fully incorporate by reference the allegations in paragraphs

1-105 above.

107.    OFAC's reliance on both the *Africa Monitor* and *The Mail & Guardian* in support

of its conclusion that Plaintiff is involved in narcotics-related money laundering activities

is unreasonable.

108.    The relevant portion of the *Africa Monitor* news article that OFAC relies upon is

inconsistent with and otherwise irreconcilable with OFAC's interpretation of the article.

OFAC's assessment of the article claims that third-party sources close to Plaintiff suggest

that Plaintiff admits to being involved in money laundering operations, purportedly in support of OFAC's conclusion that Plaintiff is involved in narcotics-related money laundering activities. However, the article itself states, without any references, that Plaintiff himself claims being involved in money laundering operations. However, Plaintiff has never made such an admission. Further, OFAC's interpretation of the article is inconsistent with the article itself. Therefore, to the extent that OFAC's conclusion relied upon the *Africa Monitor* article, it is arbitrary and capricious agency action and should be set aside by this Court.

109.    OFAC also supports its contention that Plaintiff is involved in money laundering activities by relying on a March 23, 2011 *Mail & Guardian* news article. However, OFAC's reliance on the article is so logically fallacious and irrational that it could not be ascribed to a difference in view or the product of agency expertise.

110.    The portion of the article relied upon by OFAC focuses on Luis Nhachote's belief that Plaintiff has laundered money; a belief unsupported by any facts either in the article itself or elsewhere in the Administrative Record. Indeed, although the article indicates that Mr. Nhachote investigated Plaintiff twice for money laundering, Mr. Nhachote himself is quoted in the article as having found no evidence of drug trafficking by Plaintiff during the course of his two investigations. OFAC's interpretation of this article acknowledges that Luis Nhachote was unable to find evidence linking Plaintiff to drug trafficking.

111.    With no evidence to support a claim of drug trafficking by Plaintiff, OFAC's agreement with Mr. Nhachote's belief that he "does not expect [Mr. Sulemane] to be

brought to trial in Mozambique because it might expose high-level collaborators in Mozambique's government," is irrelevant to OFAC's conclusion.

112.    OFAC's reliance on the *Mail & Guardian* news article to support a conclusion that Plaintiff is involved in narcotics-related money laundering is arbitrary and capricious agency action, and should be set aside by this Court.

### COUNT III– OFAC'S FINDING THAT IT IS UNABLE TO DETERMINE WHETHER MOHAMED BACHIR SULEMANE AND THE THREE ASSOCIATED BUSINESSES' CUSTOMS AND TAX RECORDS FROM THE MOZAMBIQUE CUSTOMS SERVICE AND REVENUE AUTHORITY IS AUTHENTIC AND COMPLETE IS ARBITRARY AND CAPRICIOUS ACTION UNDER THE APA

113.    Plaintiffs re-allege and fully incorporate by reference the allegations in paragraphs 1-112 above.

114.    On March 6, 2012, OFAC requested that Plaintiff provide the customs and tax records from the Mozambique Customs Service and Revenue Authority of merchandise imported by Plaintiff and the three allegedly associated companies from September 2, 2011 to March 6, 2012.  This request was made in order so that OFAC could assess the veracity of Plaintiff's claims that he has been in compliance with customs laws and protocols in Mozambique.  Plaintiff promptly furnished all requested records, and OFAC found that it appeared that Plaintiff had been in compliance with Mozambique's customs and tax laws since his June 1, 2010 designation under the Kingpin Act.  Nevertheless, OFAC declined to rely upon such records, citing its inability to determine whether they were authentic and complete.

115.    As OFAC itself requested the documentation, the agency would have been aware at the time of its request whether it had the capacity to verify the authenticity and completeness of the records it was requesting.

116.    At no time did OFAC raise any concerns as to the requested documents' authenticity or completeness.  Further, OFAC has provided no reason as to why the agency was unable to determine whether the documents Plaintiff provided were authentic and complete, nor has OFAC provided any reason as to why they suspect the documents would be anything other than authentic and complete.

117.    OFAC's failure to provide an explanation as to why they suspect such documents could be inauthentic or incomplete, and thus unreliable in supporting Plaintiff's assertions that he is not involved in narcotics trafficking, was arbitrary and capricious agency action, and should be set aside by this Court.

## COUNT IV– OFAC'S CONCLUSION THAT MR. SULEMANE'S SETTLEMENT OFFER OR REMEDIAL STEPS ARE INSUFFICIENT TO WARRANT THE REMOVAL OF HIS NAME AND THAT OF THE THREE COMPANIES FROM THE SDN LIST IS ARBITRARY AND CAPRICIOUS ACTION UNDER THE APA

118.    Plaintiff re-alleges and fully incorporates by reference the allegations in paragraphs 1-117 above.

119.    In concluding that Plaintiff's proposed settlement offer and remedial steps are insufficient to warrant the removal of his SDNTK designation, OFAC determined that such proposals were insufficient given his identification as a significant foreign narcotics trafficker, and that Plaintiff's "…offer of cooperation was a façade meant to cover up his narcotics trafficking activities and that he continued to meet the criteria as an [SDNTK]."

Such an explanation by OFAC is merely conclusory, as the agency fails to provide any explanation as to why they believe the remedial offer of cooperation to be a façade meant to cover up any purported narcotics trafficking activities by Plaintiff.  Therefore, OFAC's conclusion that the offer of cooperation was a façade to cover illicit activities by Plaintiff is arbitrary and capricious agency action that should be set aside by this court.

120.    In addition, OFAC reasoning that, "…the remedial steps outlined by [Mr. Sulemane] serve as a condition for his removal from the SDN List—as opposed to steps already put in place," fails to consider that Plaintiff's proposal was in accordance with the plain language of OFAC's own procedures governing unblocking and delisting from the SDN List, 31 C.F.R. § 501.807.

121.    Section 501.807 provides in relevant part that SDNTKs, "may *propose* remedial steps on the person's part, such as corporate reorganization, resignation of persons from positions in a blocked entity, or similar steps, which the person believes *would* negate the basis for designation." *See* 31 C.F.R. § 501.807 (emphasis added).  During the course of the reconsideration process, Plaintiff invoked this provision of § 501.807 several times to no avail.  A plain reading of § 501.807 demonstrates that the regulation does not require nor even suggest that the petitioner must carry out the remedial steps prior to those steps being considered by OFAC.  OFAC's line of reasoning here in finding such proposed remedial steps as insufficient to warrant the removals from the SDN List is in contravention with a plain reading of their own regulations.

122.    OFAC's *ad hoc* requirement that the remedial steps proposed by Plaintiff would first need to be implemented in order for OFAC to even consider them is inconsistent with the plain language of § 501.807.  OFAC's regulations do not require that the

remedial steps be put in place before being considered by the agency, nor did OFAC ever communicate such a requirement to Plaintiff during the nearly five (5) years that Plaintiff's reconsideration request was pending.

123.    For these reasons, OFAC's conclusion that Plaintiff's proposal of remedial steps that would negate the basis of designation was a façade to cover up narcotics trafficking activities was arbitrary and capricious agency action, and should be set aside by this Court.

## COUNT V – OFAC'S USE OF IRRELEVANT AND IMMATERIAL EVIDENCE, WITH NO PROBATIVE VALUE OR RELIABILITY, IS ARBITRARY AND CAPRICIOUS ACTION UNDER THE APA

124.    Plaintiff re-alleges and fully incorporates by reference the allegations in paragraphs 1-123 above.

125.    The *Macau Blogs* blog post relied upon by OFAC is irrelevant, immaterial, and unreliable in supporting the agency's conclusion that Plaintiff continues to be involved in narcotics trafficking.

126.    The *Macau Blogs* blog post is dated June 2, 2010, only a day after his June 1, 2010 SDNTK identification, and the blog post itself fails to provide any evidence in support of OFAC's claim that its evidence indicates that Plaintiff has otherwise continued to engage in narcotics trafficking activities within that one (1) day period.  Furthermore, the blog post itself, which is otherwise written in a first person narrative, does not provide any credentials for its unnamed author or any references for its claims made against Plaintiff.

127.    The *Mumbai Mirror* news article relied upon by OFAC is irrelevant, immaterial, and unreliable, in supporting the agency's conclusion that Plaintiff continues to be involved in narcotics trafficking.

128.    Although the *Mumbai Mirror* article mentions Plaintiff by name, it fails to provide dates for the allegations it makes against him, it does not give any indication as to how Mr. Sulemane was involved in narcotics trafficking activities, nor does it identify where the article's author obtained such information.

129.    Similarly, the portions of the *Verdade* and *Savana* reports relied upon by OFAC are irrelevant, immaterial, and unreliable in supporting the agency's conclusion that Plaintiff continues to be involved in narcotics trafficking.  This is because OFAC relies on those portions of the report that reference the same *Mumbai Mirror* article, in support of their claims against Plaintiff.

130.    Furthermore, in addition to relying upon the *Mumbai Mirror* portions of the *Verdade* report, OFAC's assessment also relies upon portions of the report that refer to unspecified Kenyan and Indian medial outlets, which OFAC itself stated were neither specified within the report nor was OFAC able to locate them.

131.    The *Africa Monitor* article that OFAC relies upon is irrelevant, immaterial, and unreliable in supporting the agency's conclusion that Plaintiff is involved in narcotics-related laundering activities.

132.    The *Africa Monitor* article claims that Plaintiff has admitted "without any reservations being involved in money laundering operations…"  It makes no reference as to when or where such an admission was made by Plaintiff, or to whom Plaintiff

otherwise stated it.  Plaintiff has never made such an admission, nor otherwise stated anything to that effect, either explicitly or by implication.

133.    Finally, the *Mail & Guardian* article is also irrelevant, immaterial, and unreliable, and fails to support OFAC's conclusion that Mr. Sulemane is involved in money laundering at all, much less laundering of drug proceeds.

134.    The *Mail & Guardian* article cites a "belief" of a purported "anti-corruption campaigner" that Mr. Sulemane laundered money sometime around 2008.  Further, the article itself concludes that the anti-corruption campaigner had no evidence to support such a belief, but was nonetheless suspicious.  Furthermore, even when the so-called anti-corruption campaigner renewed his investigation after Mr. Sulemane's June 1, 2010 SDNTK designation, all he could establish was that it is difficult to figure out how Mr. Sulemane was able to build a fortune, and that he does not expect Mr. Sulemane to ever be brought to trial in Mozambique because hearings might expose high level collaborators in government and politics.

135.    These assertions amount to one individual's unsubstantiated belief that Mr. Sulemane was involved in money laundering.  A belief that, by the individual's own admission, was formed after two investigations of the Plaintiff that yielded no evidence of involvement in money laundering of any variety.

136.    For these reasons OFAC's reliance on the aforementioned irrelevant, immaterial, and unreliable articles constitute arbitrary and capricious agency action, and should be jointly or severally set aside by this court.

**COUNT VI – OFAC'S CONCLUSION THAT MR. SULEMANE CONTINUES TO MEET THE CRITERIA FOR IDENTIFICATION PURSUANT TO THE KINGPIN ACT IS ARBITRARY AND CAPRICIOUS ACTION UNDER THE APA**

137.    Plaintiffs re-allege and fully incorporate by reference the allegations in paragraphs 1-136 above.

138.    OFAC's conclusion that Plaintiff continues to meet the criteria for identification pursuant to the Kingpin Act because he continues to play a significant role in international narcotics trafficking was not supported by a rational basis.

139.    OFAC's assessment of Plaintiff's five contentions in the Denial Memorandum and all supporting evidence disclosed to Plaintiff fail to indicate how he continues to play a significant role in foreign narcotics trafficking since his June 1, 2010 SDNTK designation.

140.    Therefore, OFAC's conclusion was arbitrary and capricious agency action, and should be set aside by this Court.

**COUNT VII – OFAC'S FAILURE TO PROVIDE ANY ACCESS TO THE REDACTED PORTIONS OF THE ADMINISTRATIVE RECORD DEPRIVED PLAINTIFF SUFFICIENT NOTICE OF THE CHARGES AND EVIDENCE AGAINST IT AND WAS ARBITRARY AND CAPRICIOUS AND WITHOUT OBSERVANCE OF PROCEDURE REQUIRED BY LAW**

141.    Plaintiffs re-allege and fully incorporate by reference the allegations in paragraphs 1-140 above.

142.    The APA mandates that a reviewing court shall hold unlawful and set aside agency action, findings, and conclusions found to be arbitrary and capricious, or not otherwise in accordance with law, and/or without observance of procedure required by law. *See* 5 U.S.C. §§ 706(2)(A) & 706(2)(D).

143.   OFAC heavily redacted significant portions of the Administrative Record provided to Plaintiff after the April 2, 2015 denial, including the evidentiary memorandum underlying the designation of Mr. Sulemane, the evidentiary memorandum underlying the designation of the three allegedly associated businesses, and the Denial Memorandum.   Even the May 2, 2016 updated copies of the Administrative Record remained heavily redacted.

144.   Markings within the Administrative Record appear to denote that OFAC based such redactions on the contents' purported classified, privileged, or sensitive nature.

145.   Without the disclosure of such information, Plaintiff is unable to understand the allegations against him in order to meaningfully respond through OFAC's administrative reconsideration process.

146.   OFAC has taken no measures to provide Plaintiff with the redacted information, such as through the disclosure of unclassified summaries of the classified and/or privileged portions of the Administrative Record that have been redacted.

147.   To the extent that OFAC's April 2, 2015 decision for denial was based upon any such redacted portions of the Administrative Record, OFAC deprived Plaintiff of his right to sufficient notice.

148.   Therefore, OFAC's failure to provide sufficient notice by not providing any portion of the redacted portions of the Administrative Record, was arbitrary and capricious agency action, and without observance of procedure required by law, and should be held unlawful and set aside.

## VII.

### RELIEF REQUESTED

NOW WHEREFORE, Plaintiff prays this court for the following relief:

1.      A declaratory judgment that holds unlawful, and sets aside OFAC's actions, findings, and conclusions as arbitrary, capricious, and/or an abuse of discretion, in violation of the Administrative Procedure Act;

2.      A declaratory judgment that holds unlawful, and sets aside OFAC's designation of Plaintiff as arbitrary, capricious, and/or an abuse of discretion, in violation of the Administrative Procedure Act;

3.      A declaratory judgment that holds unlawful, and sets aside OFAC's failure to provide sufficient notice to Plaintiff, as arbitrary and capricious, and/or without observance of procedure required by law.

4.      A writ of mandamus requiring OFAC to set aside its actions, findings, and conclusions that are arbitrary, capricious, and/or an abuse of discretion, in violation of the Administrative Procedure Act;

5.      A writ of mandamus requiring OFAC to disclose redacted portions of the Administrative Record, to the fullest extent required by law.

6.      A writ of mandamus requiring OFAC to rescind Plaintiff's designation;

7.      An injunction vacating the designation of Plaintiff as a Significant Foreign Narcotics Trafficker;

8.      Awarding Plaintiff's attorney's fees and costs incurred in this action; and

9.      Awarding Plaintiff such other and further relief as the Court deems just and proper.

Respectfully submitted this 12 day of September, 2016.

                                        /s/ Erich C. Ferrari

Erich C. Ferrari, Esq.
Ferrari & Associates, P.C.
1455 Pennsylvania Ave., NW
Suite 400
Washington, D.C. 20004
Telephone: (202) 280-6370
Fax: (877) 448-4885
Email:
Ferrari@ferrariassociatespc.com
DC Bar No. 978253