# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| MOHAMED BACHIR SULEMANE, *Plaintiff*, v. STEVEN T. MNUCHIN *et al.*, *Defendants*. | Civil Action No. 16-1822 (TJK) |

## MEMORANDUM OPINION

In 2010, the Treasury Department (the "Department") designated Plaintiff Mohamed Bachir Sulemane a significant foreign narcotics trafficker pursuant to the Foreign Narcotics Kingpin Designation Act, thereby freezing any assets he may have had in the United States. In 2015, the Department denied his request for reconsideration of his designation. The following year, Sulemane brought this lawsuit, challenging the Department's denial of his request for reconsideration. In his Complaint, Sulemane alleges seven violations of the Administrative Procedure Act. In the first six, he claims the Department erred in various ways in reaching its decision to deny his request for reconsideration. In the seventh, he claims the Department did not give him adequate notice under the APA when it refused to provide him the classified and law enforcement-privileged information supporting his designation. Sulemane also requests a writ of mandamus requiring the Department to rescind his designation or disclose this classified and privileged information to him.

Defendants moved to dismiss Sulemane's claims or, in the alternative, for summary judgment. ECF. No. 7. Sulemane then moved for summary judgment on all claims. ECF No. 9.

For the reasons explained below, the Court will grant Defendants' motion and deny Plaintiff's motion.[1]

## I. Background

### A. Statutory Background

In 1999, Congress enacted the Foreign Narcotics Kingpin Designation Act ("Kingpin Act"). *See* 21 U.S.C. §§ 1901–08. "The Kingpin Act was modeled on a specific, successful application of a similar statute, the International Emergency Economic Powers Act (IEEPA), 50 U.S.C. §§ 1701– 07 . . . [and] IEEPA itself is closely analogous to the antiterrorism provisions of the Antiterrorism and Effective Death Penalty Act of 1996, 8 U.S.C. § 1189 (AEDPA)." *Zevallos v. Obama*, 793 F.3d 106, 109–10 (D.C. Cir. 2015). "Under all three statutes, the President can designate individuals or entities as posing a threat to the security of the United States or its interests and impose sanctions on them." *Id.* at 110.

The Kingpin Act targets "significant foreign narcotics traffickers, their organizations, and the foreign persons who provide support to those significant foreign narcotics traffickers and their organizations, whose activities threaten the national security, foreign policy, and economy of the United States." 21 U.S.C. § 1902. "Narcotics trafficking" means "any illicit activity to cultivate, produce, manufacture, distribute, sell, finance, or transport narcotic drugs, controlled

---

[1] In considering these motions, the Court considered all relevant filings including, but not limited to, the following: Plaintiff's Complaint, ECF No. 1 ("Compl."); Defendants' Motion to Dismiss or, in the Alternative, for Summary Judgment, ECF No. 7 ("Defs.' Br."); Plaintiff's Opposition to Defendants' Motion to Dismiss or, in the Alternative, for Summary Judgment, ECF No. 8 ("Pl.'s Opp."); Defendants' Reply Memorandum in Support of Their Motion, ECF No. 11 ("Defs.' Reply"); the Administrative Record, ECF No. 14; Plaintiff's Supplemental Memorandum Regarding Relevant New Case Law, ECF No. 19; Defendants' Response to Plaintiff's Supplemental Memorandum, ECF No. 20; Plaintiff's Reply to Defendants' Response, ECF No. 21; Defendants' Notice of Submission for *Ex Parte*, *In Camera* Review, ECF No. 24; and Defendants' Sealed Declarations, ECF No. 25.

substances, or listed chemicals, or otherwise endeavor or attempt to do so, or to assist, abet, conspire, or collude with others to do so." *Id.* § 1907(3).

The Kingpin Act authorizes the designation of foreign persons that "play[] a significant role in international narcotics trafficking," *id.* § 1907(7), as "significant foreign narcotics traffickers," *id*. § 1903(b). In addition, it permits the designation of foreign persons who "materially assist[] in . . . the international narcotics trafficking activities" of significant foreign narcotics traffickers or are "owned, controlled, or directed by" those traffickers as "specially designated narcotics traffickers." 21 U.S.C. § 1904(b)(2)–(4); 31 C.F.R. § 598.314. Persons and entities designated under the Kingpin Act "are added to the 'Specially Designated Nationals and Blocked Persons List,' 31 C.F.R. § 501.807(a), and all their assets in the United States or under the control of any person who is in the United States are 'block[ed],' 21 U.S.C. § 1904(b), or effectively frozen." *Zevallos,* 793 F.3d at 110 (alteration in original).

A person or entity designated under the Kingpin Act "may seek administrative reconsideration" of the designation by submitting "arguments or evidence that the person believes establishes that insufficient basis exists for the designation." 31 C.F.R. § 501.807. A reconsideration request "may include arguments or evidence rebutting Treasury's 'basis . . . for the designation,' or 'assert that the circumstances resulting in the designation no longer apply.'" *Zevallos*, 793 F.3d at 110 (omission in original) (quoting 31 C.F.R. § 501.807, 807(a)). "As part of the agency's reconsideration process, designated individuals may request disclosure of the administrative record supporting the designation decision." *Fares v. Smith*, 901 F.3d 315, 319 (D.C. Cir. 2018).

The Office of Foreign Assets Control (OFAC) at the Department reviews requests for reconsideration and "provide[s] a written decision to the blocked person." 31 C.F.R.

§ 501.807(d). If OFAC denies a request for reconsideration, the blocked person may challenge that determination under the APA. *See, e.g.*, *Fares v. Smith*, 249 F. Supp. 3d 115, 129 (D.D.C. 2017), *aff'd* 901 F.3d 315 (D.C. Cir. 2018); *Zevallos v. Obama*, 10 F. Supp. 3d 111, 123–24 (D.D.C. 2014), *aff'd* 793 F.3d 106 (D.C. Cir. 2015). The Kingpin Act "provides that, to support its determinations, OFAC may submit classified information *ex parte* and *in camera* to any court considering a challenge to a designation." *Fares*, 901 F.3d at 319 (citing 21 U.S.C. § 1903(i)).

### B. Factual and Procedural Background

Sulemane is a citizen and resident of Mozambique. Compl. ¶ 15. On June 1, 2010, the Department designated him a significant foreign narcotics trafficker under the Kingpin Act. AR 442–43.[2] The Department also designated three businesses purportedly owned or controlled by Sulemane—Grupo MBS Limitada, Grupo MBS-Kayum Centre, and Maputo Shopping Centre—as specially designated narcotics traffickers under the Kingpin Act. AR 443. As a result, these designations froze "any assets the three entities may have under U.S. jurisdiction and prohibit[ed] U.S. persons from conducting financial or commercial transactions with them." AR 472.

Sulemane subsequently challenged these designations. On August 18, 2010, he submitted a proposed settlement to OFAC through which he offered to undertake certain remedial steps in exchange for his delisting. AR 1146–48. On September 29, 2010, OFAC acknowledged Sulemane's settlement offer but requested that he file a formal petition for reconsideration of his designation. AR 717–18. On November 30, 2010, Sulemane did so. AR 508–44. After receiving his formal request for reconsideration, OFAC issued two questionnaires

---

[2] Citations to "AR" refer to the page numbers that precede the notation "MBS Redacted Set" in the Joint Appendix filed by the parties. *See* ECF No. 14.

4

to Sulemane, dated March 2, 2011, and March 6, 2012, requesting additional information to evaluate his reconsideration petition. AR 734–37, 1334–35.

On February 7, 2015, Sulemane inquired as to the status of his request and again proposed a settlement. *See* AR 1323–32. In that letter, Sulemane also requested a copy of the unclassified portions of the administrative record, as well as either unclassified summaries of any classified information in it or outright disclosure of that information to his counsel, who retained a security clearance at the time. AR 1325–27.

On April 2, 2015, OFAC denied Sulemane's request for reconsideration. AR 1341–43. In a three-page letter, it concluded that "[a]fter reviewing all of the evidence before OFAC, including law enforcement sensitive, diplomatic, classified, and open source information, we do not find Mr. Sulemane's claims that he has not engaged in narcotics trafficking to be credible." AR 1342. The letter went on to inform Sulemane that "[m]ultiple sources indicate that he has engaged, and continues to engage, in narcotics trafficking." *Id.* The letter further explained the basis for its conclusion as follows:

- Sulemane "had financial dealings and relations with persons engaged in narcotics trafficking, such as Dawood Ibrahim, who was identified by the President as a Tier I Drug Kingpin in June 2006." *Id.*

- Open source reporting had referred to Sulemane as "a narcotics trafficker who conceals narcotics in trucks importing goods into Mozambique," a "drug baron," and a "'drug underworld rival' to several detained and prominent narcotics traffickers in Kenya." *Id.*

- OFAC had "reason to believe that Sulemane "engaged in corrupt activities to further his narcotics-related activities," such as circumventing port scanners to import narcotics into Mozambique. *Id.*

- OFAC had reason to believe that Sulemane's "violations of customs procedures, foreign exchange regulations, and tax evasion announced by the Government of Mozambique in September 2011 are related to his involvement in narcotics trafficking and money laundering." *Id.*

5

- Open source reporting indicated that Sulemane had "admitted to being involved in money laundering through the importation of goods." *Id.*

- Sulemane had confirmed that he owned or controlled Grupo MBS Limitada and Grupo MBS-Kayum Centre in a May 2011 letter to OFAC. *Id.*

- Sulemane had financed the construction of the Maputo Shopping Centre, maintained an office there, and, although he claimed to have transferred ownership, did not publicly deny that he was the current owner. *Id.* OFAC also had reason to believe that Sulemane had continued to use the Maputo Shopping Centre to materially assist his trafficking activities. *Id.*

In the letter, OFAC also concluded that the remedial steps Sulemane proposed were insufficient to justify the removal of his designation under the Kingpin Act. *Id.*

On August 18, 2015, OFAC provided Sulemane with the unclassified, nonprivileged portions of the administrative record upon which it relied in initially designating him under the Kingpin Act, as well as in denying his request for reconsideration. AR 1344–45. On November 23, 2015, Sulemane requested that OFAC release portions of the record that had been redacted but were unclassified. AR 1346–48. On May 2, 2016, OFAC provided an updated administrative record in which the Department lifted redactions from certain information, both in an evidentiary memorandum supporting Sulemane's initial designation and a similar memorandum supporting the denial of his request for reconsideration. *See* AR 1349–50. However, it continued to withhold information it deemed unclassified but law enforcement-privileged. *Id.*

In the evidentiary memorandum related to his denial for reconsideration, OFAC characterized Sulemane's arguments for reconsideration as follows: that (1) he had never been involved with narcotics trafficking and has no financial relationship with narcotics traffickers; (2) he had never been involved in money laundering; (3) the Maputo Shopping Centre was actually owned by his wife and sons; (4) violations of customs and foreign exchange procedures announced by the Government of Mozambique against him in September 2011 were unrelated to

6

drug trafficking; and (5) he had proposed several remedial steps in exchange for removal of him and his associated companies from the list. AR 449. OFAC then outlined each of Sulemane's arguments in detail and explained its reasoning for rejecting them. AR 449–65.

On September 12, 2016, Sulemane filed this lawsuit. The Complaint asserts seven causes of action under the Administrative Procedure Act (APA), 5 U.S.C. § 551 *et seq*. *See* Compl. ¶¶ 94–148. The first six assert that specific conclusions by OFAC related to its denial of Sulemane's request for reconsideration—that he continued to be involved in narcotics trafficking (Count I) and narcotics-related money laundering (Count II); that OFAC was unable to determine whether tax records submitted by him and his businesses were authentic (Count III); that his proposed settlement was inadequate (Count IV); that OFAC relied on irrelevant and immaterial evidence in reaching its determination (Count V); and that its ultimate conclusion that Sulemane met the criteria for designation under the Kingpin Act (Count VI)—were arbitrary and capricious.[3] Compl. ¶¶ 94–140. Sulemane's seventh cause of action alleges that OFAC's failure to provide him with those portions of the administrative record that remain redacted because they are classified or law enforcement-privileged deprived him of adequate notice. Compl. ¶¶ 141–48. He seeks wide-ranging relief, including various declaratory judgments, an injunction, attorney's fees, and, notably, a writ of mandamus. Compl. at 42–43.

On December 5, 2016, Defendants moved for summary judgment on Sulemane's APA claims.[4] ECF No. 7. On December 19, 2016, Sulemane cross-moved for summary judgment.

---

[3] Sulemane does not appear to challenge the designations of the three companies associated with him.

[4] Defendants have styled their motion as one seeking dismissal or, in the alternative, summary judgment. *See* ECF No. 7. However, because reviewing agency action under the APA requires looking to the administrative record, APA claims are typically resolved on summary judgment.

ECF No. 9. On March 20, 2018, the Court ordered Defendants to submit affidavits to the Court asserting and explaining the applicability of law enforcement privilege. ECF No. 22. The parties' cross-motions for summary judgment are now before the Court.

## II. Legal Standard

"Summary judgment is appropriately granted when, viewing the evidence in the light most favorable to the non-movants and drawing all reasonable inferences accordingly, no reasonable jury could reach a verdict in their favor." *Lopez v. Council on Am.-Islamic Relations Action Network, Inc.*, 826 F.3d 492, 496 (D.C. Cir. 2016). "The evidence presented must show 'that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law.'" *Id.* (quoting Fed. R. Civ. P. 56(a)).

In an APA case where both parties have moved for summary judgment, "the district judge sits as an appellate tribunal" and "[t]he entire case on review is a question of law." *Am. Bioscience, Inc. v. Thompson*, 269 F.3d 1077, 1083 (D.C. Cir. 2001) (internal quotation marks and footnote omitted). "Summary judgment . . . serves as the mechanism for deciding, as a matter of law, whether the agency action is supported by the administrative record and otherwise consistent with the APA standard of review." *Kadi v. Geithner*, 42 F. Supp. 3d 1, 9 (D.D.C. 2012).

When courts "examine an agency's decision, [they] apply the APA's highly deferential standard, meaning that [they] may set aside [the agency's] action only if it is arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." *Zevallos*, 793 F.3d

---

Here, the parties have filed an administrative record supporting the agency's decision. Accordingly, the Court treats Defendants' motion as one for summary judgment insofar as it addresses Sulemane's APA claims, and as a Rule 12(b)(1) motion to dismiss insofar as it addresses his request for a writ of mandamus.

8

at 112 (internal quotation marks omitted) (quoting *Islamic Am. Relief Agency v. Gonzales*, 477 F.3d 728, 732 (D.C. Cir. 2007)).[5] The Court "may not substitute [its] judgment for OFAC's, but [the Court] will require it to 'examine the relevant data and articulate a satisfactory explanation for its action including a rational connection between the facts found and the choice made.'" *Islamic Am. Relief Agency*, 477 F.3d at 732 (quoting *Motor Vehicle Mfrs. Ass'n of the U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983)).

"[W]hen review of an agency's action is 'bound up with a record-based factual conclusion,' the reviewing court must determine whether that conclusion 'is supported by substantial evidence.'" *Water Quality Ins. Syndicate v. United States*, 225 F. Supp. 3d 41, 63 (D.D.C. 2016) (quoting *Dickinson v. Zurko*, 527 U.S. 150, 164 (1999)). "The 'substantial evidence' standard requires more than a scintilla, but can be satisfied by something less than a preponderance of the evidence." *FPL Energy Me. Hydro LLC v. FERC*, 287 F.3d 1151, 1160 (D.C. Cir. 2002).

## III. Analysis

### A. Whether the Department's Denial of Reconsideration of Sulemane's Kingpin Act Designation Was Arbitrary and Capricious

The Court has reviewed all the material upon which OFAC relied in denying Sulemane's request to reconsider his designation as a significant foreign narcotics trafficker under the Kingpin Act, including classified information and that for which Defendants have asserted a law

---

[5] "[I]n the special context of an executive designation like the one at issue in this case, the D.C. Circuit has suggested that an even more deferential review applies when matters of foreign policy and national security are concerned." *Zevallos*, 10 F. Supp. 3d at 119 (citing *Islamic Am. Relief Agency*, 477 F.3d at 734). But the Court need not determine whether this extra-deferential standard applies in this case.

9

enforcement privilege.[6] After doing so, the Court has little trouble concluding that there is substantial evidence in the record to support the conclusion that Sulemane was a significant foreign narcotics trafficker, *i.e.*, that he played a significant role in international activity to "cultivate, produce, manufacture, distribute, sell, finance, or transport narcotic drugs." 21 U.S.C. § 1907. Moreover, the evidence—including the classified and law enforcement-privileged information—does not run afoul of the APA's bar on that which is "irrelevant, immaterial, or unduly repetitious." 5 U.S.C. § 556(d). Therefore, OFAC's denial of his request to reconsider his designation was not arbitrary and capricious.

None of Sulemane's arguments affect this overarching conclusion. First, Sulemane argues that OFAC's determinations that he continued to be involved in narcotics trafficking and narcotics-related money laundering were arbitrary and capricious because they were based on open-source news articles that were unreliable and of limited value.[7] *See* Pl.'s Opp. at 16–23. But the bulk of the evidence supporting Sulemane's designation is either classified or law

---

[6] As discussed below, Sulemane argues that the Department failed to comply with the APA's notice requirement when it did not provide him with this classified and law enforcement-privileged information. However, the Court knows of no reason why it may not review this information to evaluate whether OFAC's denial was arbitrary and capricious. Indeed, the Kingpin Act specifically allows classified evidence to be submitted to the Court in these circumstances. 21 U.S.C. § 1903(i). The question of whether Sulemane must be provided this information is a separate matter.

[7] The Court notes that the question before it is whether the entire record provides substantial evidence for the final agency action at issue—the denial of Sulemane's request to reconsider his designation as a significant foreign narcotics trafficker—such that it was not arbitrary and capricious. And under the terms of the statute, his designation could be supported by *either* evidence of narcotics trafficking or narcotics-related money laundering. *See* 21 U.S.C. § 1907(3). In this case, however, the Court concludes there is substantial evidence of both.

enforcement-privileged.[8] Therefore, the lawfulness of OFAC's decision hardly turns on these articles, and the Court need not decide whether, standing alone, they would suffice to uphold it. Nonetheless, the law in this Circuit is clear that OFAC may rely on such "[u]nverified open source materials" to support its decision to deny reconsideration. *Zevallos*, 793 F.3d at 112–13 (alteration in original). OFAC cited a handful of articles to support its decision to deny Sulemane's request for reconsideration. *See* Defs.' Br. at 11–14. Two articles from November 2014 reported that Sulemane had been kidnapped that month and, at least in OFAC's reading, link his kidnapping to the similar abduction of four drug traffickers in Kenya, including an alleged rival of his. AR 1311–15. Another article at that same time alleged that Sulemane had sent "his men to eliminate" another trafficker. AR 1316. OFAC also cited a March 2011 article quoting a Mozambican "anti-corruption campaigner" as stating that he believed Sulemane had

---

[8] Although Sulemane has not specifically challenged the application of the law enforcement privilege to the material at issue, the Court concludes that the privilege was properly invoked. The law enforcement privilege is a qualified one that "serves to preserve the integrity of law enforcement techniques and confidential sources, protects witnesses and law enforcement personnel, safeguards the privacy of individuals under investigation, and prevents interference with investigations." *Tuite v. Henry*, 181 F.R.D. 175, 176–77 (D.D.C. 1998), *aff'd*, 203 F.3d 53 (D.C. Cir. 1999) (unpublished table decision). For the government to assert the law enforcement privilege "(1) there must be a formal claim of privilege by the head of the department having control over the requested information; (2) assertion of the privilege must be based on actual personal consideration by that official; and (3) the information for which the privilege is claimed must be specified, with an explanation why it properly falls within the scope of the privilege." *In re Sealed Case*, 856 F.2d 268, 271 (D.C. Cir. 1988). OFAC has made a formal claim of privilege in sealed declarations provided *ex parte* and *in camera* that reflect actual, personal consideration by the officials invoking the privilege and that explain why the material falls within the scope of the privilege. ECF No. 25. In determining the scope of the privilege, the Circuit has directed courts to conduct a ten-factor balancing test set forth in *Frankenhauser v. Rizzo*, 59 F.R.D. 339, 344 (E.D. Pa. 1973). *See Tuite v. Henry*, 98 F.3d 1411, 1418–19 (D.C. Cir. 1996). After weighing all ten of those factors, the Court concludes that the information is properly covered by the privilege, especially in light of the specific explanations provided as to why the material is properly covered by it. *See* ECF No. 25 ¶¶ 8–20; ECF No. 25-1 ¶¶ 6–15.

laundered money but would not be brought to trial in Mozambique due to corruption, AR 1158–61, and two articles from summer 2010 that reported Sulemane was involved in "drug[]-connected dealings" and other efforts to evade customs by fueling government corruption, AR 928–33, and that he had admitted to money laundering, AR 941–44. Although the Court "acknowledge[s] that [this] . . . evidence is not overwhelming," *Islamic Am. Relief Agency*, 477 F.3d at 734, these articles, taken together, provide modest support for OFAC's decision to deny reconsideration. To be sure, some of them are old, some could be better-sourced, and some "could be viewed in a light more beneficial" to Sulemane. *Zevallos*, 793 F.3d at 114. But as discussed above, in the end, the Court's conclusion that OFAC's denial was not arbitrary and capricious simply does not turn on this open-source information.[9] The entire record contains sufficient evidence to justify OFAC's conclusions that Sulemane continued to be involved in narcotics trafficking and related money laundering.

Sulemane also argues that OFAC erred by failing to explain its statement—buried in a footnote in one of its evidentiary memoranda—that it was "unable to determine" whether the records he submitted regarding his compliance with Mozambican customs and tax laws were authentic and complete. AR 460. But nothing in the record suggests that the question of

---

[9] Sulemane also challenges the use of these public reports because they are hearsay, arguing that courts have limited the use of hearsay evidence in national security-related cases. *See* Pl.'s Opp. at 13–15. The cases to which he cites, however, arise in wholly different contexts; most concern petitions for writs of habeas corpus by individuals designated as enemy combatants. *See id.* (citing *Al Odah v. United States*, 559 F.3d 539 (D.C. Cir. 2009); *Parhat v. Gates*, 532 F.3d 834 (D.C. Cir. 2008); *Al-Adahi v. Obama*, 597 F. Supp. 2d 38 (D.D.C. 2009)). By contrast, in a context much closer to the one here—the Department's designations of foreign terrorist organizations under IEEPA—the Circuit has expressly approved the use of hearsay evidence. *See Holy Land Found. for Relief and Dev. v. Ashcroft*, 333 F.3d 156, 162 (D.C. Cir. 2003); *Nat'l Council of Resistance of Iran v. Dep't of State*, 251 F.3d 192, 196 (D.C. Cir. 2001). Therefore, the Court sees no reason why OFAC could not have considered these reports simply because they are, or may contain, hearsay.

whether these records were authentic and complete impacted OFAC's denial of his request for reconsideration such that an explanation was warranted. In fact, it appears OFAC treated the records as authentic and complete, insofar as it concluded in that same footnote that they indicated that Sulemane had been complying with Mozambique's customs and tax laws since his designation. *Id.* And even assuming their authenticity and completeness, these records do not have the capacity to meaningfully negate the other classified and law enforcement-privileged information in the record, including information referenced in OFAC's evidentiary memorandum, that suggested Sulemane's continued involvement in narcotics trafficking and justified the denial of his request for reconsideration. AR 461–63.

*Epsilon Electronics, Inc. v. United States Department of the Treasury*, 857 F.3d 913 (D.C. Cir. 2017), cited by Sulemane in a supplemental memorandum, *see* ECF No. 19, is not to the contrary. In that case, the Circuit found that OFAC had not adequately explained its decision to discount email evidence that was directly relevant to Epsilon's knowledge about whether its shipments were intended for reexport to Iran, an issue on which the legality of its conduct turned. *Epsilon Electronics*, 857 F.3d at 927–29. In contrast, OFAC's alleged failure to explain why it was unable to determine whether the records submitted by Sulemane were authentic and complete was largely immaterial to its ultimate decision, for reasons explained above. First, it appears that OFAC did weigh these records in its analysis as authentic and complete, so its inability to confirm their authenticity and completeness hardly needed explaining. And second, unlike the evidence in *Epsilon*, by their nature these records do not have the capacity to counter the other evidence in the record which led OFAC to conclude that Sulemane continued to be a significant foreign narcotics trafficker. In this case, therefore, "the agency's path may reasonably be discerned." *Id.* at 928 (quoting *Motor Vehicle Mfrs. Ass'n*, 463 U.S. at 43).

13

Finally, Sulemane argues that OFAC's alleged failure to explain its refusal of his settlement offer, and its conclusion that the offer was merely a façade intended to cover up his continuing narcotics trafficking, was also itself arbitrary and capricious. See Pl.'s Opp. at 25–27. Again, the Court cannot agree. In fact, OFAC explained its reasons for rejecting his offer—that it would not ultimately result in him qualifying for delisting because of his ongoing trafficking activity—in both its denial letter and in its evidentiary memorandum. And for the reasons explained above, there is substantial evidence in the record, including classified and law enforcement-privileged information, to justify OFAC's decision to reject it.

Sulemane asserts that OFAC's reasoning was based on an incorrect application of its regulations that permit a designee to propose remedial steps that would negate the reasons for his designation. See Pl.'s Opp. at 26–27; 31 C.F.R. § 501.807. He argues that OFAC rejected his offer simply because it had not yet been implemented, which the regulations do not require. But the record is clear that OFAC's reasoning did not turn on this point. In fact, OFAC quite reasonably concluded that, even if Sulemane's suggested remedial steps had been implemented, based on his ongoing activities he would still have qualified as a significant foreign narcotics trafficker. Therefore, irrespective of his suggested remedial steps, his designation could only be reconsidered when he "cease[d] playing a significant role in international narcotics trafficking." AR 464.

### B. Whether the Department Provided Adequate Notice to Sulemane Under the APA

Sulemane also alleges that OFAC's failure to provide him access to the classified and law enforcement-privileged portions of the administrative record was arbitrary and capricious, and otherwise not in accordance with the applicable procedures required by law. Compl. ¶¶ 141–48. Specifically, Sulemane suggests that OFAC's failure to produce this information to him violates

14

the APA's notice requirement, 5 U.S.C. § 555(e). *See* Pl.'s Opp. at 29–35. The Court concludes that the information OFAC did in fact provide to Sulemane clearly satisfied this requirement.

The APA requires that a denial of a petition include "a brief statement of the grounds for denial." 5 U.S.C. § 555(e). This notice requirement is not onerous. *See Roelofs v. Sec'y of the Air Force*, 628 F.2d 594, 601 (D.C. Cir. 1980) ("[I]t probably does not add to, and may even diminish, the burden put on an agency by the APA's provision for judicial review."). "At its core, this requirement simply forces the agency to explain 'why it chose to do what it did.'" *Ark Initiative v. Tidwell*, 895 F. Supp. 2d 230, 242 (D.D.C. 2012) (quoting *Tourus Records, Inc. v. DEA*, 259 F.3d 731, 737 (D.C. Cir. 2001)).

OFAC provided Sulemane much more than the "brief statement" of its grounds that the statute requires. OFAC's denial of Sulemane's request for reconsideration was communicated to him in a detailed, three-page letter. AR 1341–43. That letter included four paragraphs describing the reasons for OFAC's decision. AR 1342. With regard to Sulemane's personal designation as a significant foreign narcotics trafficker, the letter informed him that "[a]fter reviewing all of the evidence before OFAC, including law enforcement sensitive, diplomatic, classified, and open source information," OFAC did not "find [his] claims that he has not engaged in narcotics trafficking to be credible." *Id.* The letter went on to inform Sulemane that "[m]ultiple sources indicate that he has engaged, and continues to engage, in narcotics trafficking." *Id.* The letter explained that, for example:

> he has had financial dealings and relations with persons engaged in narcotics trafficking, such as Dawood Ibrahim, . . . open source reporting noted that [he] is a narcotics trafficker who conceals narcotics in trucks importing goods into Mozambique[,] . . . [and] open source reporting has referred to [him] as a "drug baron" and a "drug underworld rival" to several detained and prominent narcotics traffickers in Kenya.

*Id.* Further, OFAC explained that it

15

> has reason to believe that [he] has engaged in corrupt activities to further his narcotics-related activities, which have permitted him, for instance, to circumvent port scanners and import narcotics into Mozambique. Also, OFAC has reason to believe that [his] violations of customs procedures, foreign exchange regulations, and tax evasion announced by the Government of Mozambique in September 2011 are related to his involvement in narcotics trafficking and money laundering. Further, open source reporting has also noted that [he] has admitted to being involved in money laundering through the importation of goods.

*Id.* The letter's explanation as it related to Sulemane's businesses and the inadequacy of his proposed remedial steps contains a similar level of detail.

But OFAC did not stop there. Subsequently, it provided Sulemane its evidentiary memoranda supporting both Sulemane's initial designation and OFAC's denial of his reconsideration request. Even though portions of those memoranda remained redacted, their production to Sulemane further bolsters the conclusion that OFAC adequately explained to him why it "chose to do what it did." *Tourus Records*, 259 F.3d at 737.

Sulemane argues that the APA's notice requirement was violated because he was not provided access to the classified and law enforcement-privileged information upon which OFAC relied. But especially given OFAC's determination that he remained a significant foreign narcotics trafficker, it is quite obvious why it did not provide him this information, which could reveal the government's sources and methods. And simply put, the APA provides no basis for him to demand it. The APA's notice provision merely requires OFAC to tell Sulemane its grounds for the denial of his request for reconsideration. As described above, OFAC's notice was both comprehensive and detailed. The statute does not require OFAC to provide Sulemane the classified or law enforcement-privileged information supporting those grounds. And finally, although it is common for plaintiffs who challenge designations under the Kingpin Act and IEEPA to argue that their constitutional rights under the Fifth Amendment's Due Process Clause were violated because they did not have access to information supporting their designation, *see,*

16

*e.g.*, *Fares*, 249 F. Supp. 3d at 124–29, the Court need not consider such an argument because Sulemane does not advance any constitutional claim.

   C.   **Mandamus**

In his prayer for relief, Sulemane also requests a writ of mandamus. *See* Compl. at 43. "To show entitlement to mandamus, plaintiffs must demonstrate (1) a clear and indisputable right to relief, (2) that the government agency or official is violating a clear duty to act, and (3) that no adequate alternative remedy exists." *Am. Hosp. Ass'n v. Burwell*, 812 F.3d 183, 189 (D.C. Cir. 2016). "These three threshold requirements are jurisdictional; unless all are met, a court must dismiss the case for lack of jurisdiction." *Id.* Defendants contend, and Sulemane does not dispute, that Federal Rule of Civil Procedure 12(b)(1) governs Sulemane's request for mandamus. *See* Defs.' Br. at 10; Pl.'s Opp. at 12. "When a party moves to dismiss for lack of subject matter jurisdiction under Rule 12(b)(1), 'the person seeking to invoke the jurisdiction of a federal court . . . bears the burden of establishing that the court has jurisdiction.'" *Brookens v. Acosta*, 297 F. Supp. 3d 40, 44–45 (D.D.C. 2018) (omission in original) (quoting *Hamidullah v. Obama*, 899 F. Supp. 2d 3, 6 (D.D.C. 2012)).

Defendants argue that Sulemane has failed to make out a claim for mandamus relief under the federal mandamus statute, 28 U.S.C. § 1361. *See* Defs.' Br. at 19. But even assuming that he has, he has failed to establish that he is entitled to mandamus. Sulemane has not shown a "clear and indisputable right to relief," *Am. Hosp. Ass'n*, 812 F.3d at 189, because, as explained above, OFAC's denial of his request for reconsideration was not arbitrary and capricious, and OFAC did not deny him adequate notice under the statute by withholding the classified and law enforcement-privileged information supporting its denial. Thus, he is not entitled to mandamus, and the Court will dismiss his request for that remedy for lack of subject-matter jurisdiction.

## IV. Conclusion

For the foregoing reasons, the Court will grant Defendants' motion to dismiss or, in the alternative, for summary judgment, ECF No. 7, and deny Plaintiff's cross-motion for summary judgment, ECF No. 9. A separate order will issue.

/s/ Timothy J. Kelly
TIMOTHY J. KELLY
United States District Judge

Date: January 2, 2019